UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )  | |
| )  | |
| v.   )  | No. 1:23CR00260-001 |
| )  | |
| )  | |
| JACQUELYN STARER   )  | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The defendant, Jacquelyn Starer, respectfully says as follows for her sentencing memorandum. Jacquelyn Starer travelled to Washington D.C. to hear President Trump's speech on the Ellipse on January 6th and protest in support of his contention that the 2020 election was stolen. She did not have plans to meet anyone in Washington, DC, and certainly had no plans of committing any violence when she embarked on the trip. Dr. Starer has no affiliation with any extremist group and intended only to go to Washington, DC to peacefully protest. At the conclusion of President Trump's speech, she walked with other protestors towards the Capital as President Trump had suggested in his speech. Upon arriving at the East Door, she unlawfully entered the Capitol and initially found the atmosphere inside to be fairly calm.

However, shortly after entering she was drawn towards an oral confrontation between police and protestors and approached a line of officers in the rotunda. She got into a heated discussion with another protestor pushing his arm down away from her as she felt he was invading her space. During this heated encounter with the other protestor Dr. Starer turned away from the line of officers and Officer M.B. was no longer in her field of vision. Officer M.B. pushed Dr. Starer in the back away from the line of officers.

Dr. Starer reacted by turning and striking Officer M.B. in the arm and engaging in a brief confrontation with her during which she referred to M.B. as a "fucking bitch". Shortly after this the situation in the Rotunda became more chaotic with pepper spray being deployed. Dr. Starer was affected by the pepper spray and had difficulty seeing.

Eventually she was guided out of the Capital with the assistance of a capital police officer and received treatment to help her eyes from a second capital police officer. The total time Dr. Starer spent in the Capital was roughly fifteen minutes. Dr. Starer did not learn of the full extent of what happened at the Capital until she returned to her hotel room later that day and saw news reports and videos regarding the full scope of what had taken place.

## GUIDELINE CALCULATION

### A. The Official Victim Enhancement Does Not Apply

Counts 1,2, and 5 are to be grouped because they involve the same victim and same act or transaction pursuant to USSG §3D1.2(a)[1]. The guideline for group 1 is found in §2A2.2[2] of the guidelines and the base offense level is 14. Both Probation and the Government contends an additional 6 point enhancement is added because of the official victim enhancement pursuant to USSG §3A1.2(a).

---

[1] "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a)When counts involve the same victim and the same act or transaction."

[2] "Aggravated Assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling suffocating or attempting to strangle or suffocate; or (D) an intent to commit another felony" In Dr. Starer's case the applicable definition is (D) an intent to commit another felony, the civil disorder.

The Government seeks to apply the enhancement under U.S.S.G. § 3A1.2(b) to Counts One and Two. The guideline states in relevant part:

(Apply the greatest):

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction *was motivated by such status*, increase by **3** levels;

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by **6** levels.

U.S.S.G. § 3A1.2 (italics added; bolding original).

The Sentencing Commission further clarifies the emphasized phrase in the commentary:

"Motivated by such status", for purposes of subsections (a) and (b), means that the offense of conviction was motivated by the fact that the victim was a government officer or employee, or a member of the immediate family thereof. This adjustment would not apply, for example, where both the defendant and the victim were employed by the same government agency and the offense was motivated by a personal dispute . . . .

Id. § 3A1.2 cmt. n.3.

For the enhancement to apply, the defendant must have been driven to act by the victim's status, not merely by personal animus. In the present case while Officer M.B. meets the definition of a government officer or employee Dr. Starer's assault was not motivated by such status. Attached to this memorandum as Exhibit 1 is the body worn camera of another officer positioned next to M.B. who captured the clearest view of the assault on Officer M.B. As can be seen in the video[3] at timestamp 14:59:00 Dr. Starer approaches the line of officers and pointed her finger toward the officers. At no time did she attempt to engage the officers in a physical confrontation prior to the assault, nor does

---

[3] The video referenced is the body camera video of K. Danko made available to the court as a joint exhibit through the USAfx discovery system.

she engage in making any threatening or demeaning statements towards the line of officers.

At approximately 14:59:17 on the timestamped video Dr. Starer is pointing to the area behind the officers. She then gets upset with another protestor who she feels in touching her and is in her personal space. She reacts to him by grabbing his arm and pulling it down and yelling at him. During this confrontation she turns to face the other protestor and Officer M.B. is no longer in her field of vision. Officer M.B. then pushes Dr. Starer in the back, in response Dr. Starer turns back toward Officer M.B. and strikes her on the arm. Dr. Starer and Officer M.B. then faced off in a brief confrontation during which Dr. Starer can be heard calling Officer M.B. a "fucking bitch". Dr. Starer deeply regrets this entire interaction, and fully recognizes it constitutes criminal conduct on her part.

Dr. Starer had an immediate instinctive reaction to being pushed from behind by striking the person who pushed her. That person's status as police officer was merely incidental; indeed Dr. Starer had just responded to an unwanted intrusion into her personal space by another protestor by physically grabbing his arms and pushing them down. Certainly she was inclined to react to unwanted physical contact with physical contact of her own regardless of the status of the other person involved. Moreover, during the ensuing confrontation with Officer M.B. Dr. Starer referred to her as a fucking bitch – a personal insult, not political or related to her status as a police officer. Dr. Starer greatly regrets her use of this language and her insult toward Officer M.B., however her choice of insult is of factual importance to the case. Had Dr. Starer called her a "traitor"

or used some derogatory term for a police officer as many other protestors did on January 6th it would have perhaps revealed that the assault was motivated by her status as an officer, however, here were a personal insult was used it shows the assault was motivated by her reaction to Officer M.B.'s physical contact rather than her status as an officer. Thus, similar to the example of disputing agency employees in the commentary, Dr. Starer was not motivated by the victim's "status" as police officers, and the enhancement does not apply.

It is true that at least two appellate courts might support the Government's argument for the enhancement's applicability in this case. See United States v. Williams, 520 F.3d 414, 424 (5th Cir. 2008, United States v. Talley, 164 F.3d 989, 1003-1004. In Williams, the defendant, a federal prisoner, assaulted a corrections officer after alleging inappropriate conduct during a pat-down search. The enhancement was applied because the attack stemmed from the officer's official duties.

Citing Talley, the 5th circuit stated:

"We have previously never considered an argument similar to that advanced by Williams: namely, that the assault was motivated not by Officer Bordelon's official status, but by his inappropriate touching, which was more akin to a personal dispute." Id.

The Fifth Circuit upheld the enhancement, stating:

 "Here, the sole reason Williams's allegation of improper touching by Officer Bordelon arose was because Officer Bordelon was employed as a corrections officer at USP Pollock. Accordingly, we agree with the district court that Williams's assault was motivated by Officer Bordelon's status." Id. See also Talley, 164 F.3d at 1004 (finding the enhancement was appropriately applied to a defendant who solicited the murder of an FBI agent to prevent the agent from testifying because the agent's employment was the only reason he had become a witness in the case)

Nevertheless, this reasoning contradicts the guideline's clear language, as well as the commentary's emphasis on "personal dispute." The enhancement applies if the victim has a specific status and "the offense of conviction was motivated by such status." U.S.S.G. § 3A1.2(a)

It is crucial that the victim's status is the driving force behind the defendant's actions, rather than merely a surrounding circumstance. The guideline uses the phrase "motivated by," not "because of," yet the Fifth and Sixth Circuits interpret it using a but-for causation standard.

For these courts, as long as the defendant would not have acted but for the victim's official status, the enhancement applies. However, mere but-for causation is inadequate, as demonstrated by the commentary regarding "personal disputes." In a conflict between two agency employees, the feud wouldn't exist without their shared employment, just as the dispute in Williams, wouldn't exist without the victim's position as a corrections officer. As the commentary suggests, although the personal dispute would not have arisen without the official status, this causation is inadequate to engage the enhancement. The defendant's actions must be specifically "motivated by" the victim's status.

A better interpretation of the guideline can be found in the District Court's opinion in United States v. Kohut, 553 F. Supp. 3d 964, 971 (D.N.M. 2021). In this case, a postal worker was delivering mail when the defendant brandished a knife and demanded a cigarette. The court declined to impose the official-victim enhancement, noting that the defendant didn't act because the victim held an official status; his

motivation was tied to his urgent need for a cigarette and the symptoms of his mental illness rather than the victim's job.

Similarly, in this case, the police officer could have been anyone pushing Dr. Starer from behind and Dr. Starer would have reacted the same. Her actions were not "motivated by" Officer M.B.'s status as law enforcement. Therefore, the enhancement is not applicable.

### B. Grouping Analysis

The Government initially argued that there are two separate groups the first consisting of counts 1,2, and 5 and the second consisting of counts 3 and 4. The Government initially argued that Group 1 has a base offense level of 20 and Group 2 has a base level of 14 resulting in an additional 1.5 units placing the Combined Offense Level at 21. After lengthy discussions the Government acknowledged that analysis was not correct and now calculates the combined Offense Level at 20, with no point assigned from grouping. Probation initially acknowledged no grouping points were necessary in their draft report, but has now adopted the Government's analysis from its response to the PSR placing the Combined Offense Level at 21. Probation is incorrect in its assessment of the additional unit from the grouping analysis.

Probation's is incorrect to assign any additional units as a result of the higher base offense level. Pursuant to U.S.S.G. §3D1.2(c)[4] Counts 3 and 4 would group with Counts 1, 2, and 5 because the conduct in counts 1, 2 and 5 constitute the basis for an adjustment to the guideline applicable to counts 3 and 4. In its response the PSR the Government acknowledged provided their basis for the adjustment to the base level of 14 for count 3 as follows:

> "Starer entered and remained in the restricted area of the U.S. Capitol Building and Grounds, in violation of 18 U.S.C. § 1752(a)(1), for the purpose of obstructing or interfering with law enforcement officers who were engaged in the lawful performance of official duties during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). Starer obstructed and interfered with Officer M.B. as described above in Count One. Therefore, the substantive offense is Count One, charging Civil Disorder, and the guideline used for Count One – U.S.S.G. § 2A2.2 – applies here."

Likewise as to count 4 the Government stated in the presentencing report response:

> "Pursuant to U.S.S.G. §2A2.4, the Base Offense Level is 10. But U.S.S.G. §2A2.4(c) directs that the cross-reference in §2A2.2 applies "if the conduct constituted aggravated assault.""

---

[4] All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

By the Government's own analysis the basis for adjusting the offense level to fourteen is the conduct from counts 1, 2 and 5, it appears Probation is using this same reasoning. The Government now agrees there are no additional points in a grouping analysis because of the application of U.S.S.G. §3D1.2(c) In another January 6th case with identical charges USA v. Troy Sargent (1:21-CR-258-TFH) the Government agreed to this same analysis and the Court did not assess any additional units under a grouping analysis. Because the offense level of Group 2 only reaches 14 due to the conduct alleged in Group 1 U.S.S.G. §3D1.2(c) applies and no additional units should be assessed.

## **PERSONAL CHARACTERISTICS**

The presentence report prepared by the probation officer contains a detailed and accurate description of Jacquelyn Starer's personal history and characteristics. What it fails to convey, however, is the kind of person Dr. Starer has been and is. Dr. Starer was born in 1954 and is currently 70 years old. Her childhood was spent in Wisconsin where she was raised by her father and mother. Both her parents struggled with mental health issues. Her mother struggled with chronic depression and manic episodes. Her father battled PTSD from the persecution he suffered as a Jewish person in Nazi Austria. At the age of fourteen her father and his family were forced to flee their home country. After two failed attempts to leave the family finally successfully fled Austria. However the turmoil of the journey on a smuggling ship and 2 years spent in limbo in British controlled Palestine before finally settling in the U.S. haunted him for the rest of his life. Despite these struggles Dr. Starer excelled at school in her suburban town. She attended

both undergraduate and medical school at the University of Wisconsin. Since obtaining her medical degree Dr. Starer has spent her entire adult life helping people with great care and compassion. As a medical doctor for over 40 years, Dr. Starer helped thousands of patients with complicated medical struggles. Early in her career Dr. Starer practiced in the field of OBGYN medicine helping pregnant woman navigate their pregnancies and performing gynecological surgery up until 1996. She then continued with office gynecology for several years. During this period of her life she married her first husband and had her only child in 1988. After giving birth to her son Dr. Starer found herself becoming more and more depressed as a new mother who was attempting to launch a new medical practice without any support from her husband, and she fell into depression. She sought the help of a psychiatrist and was put on anti-depressant medication. The medication caused headaches which caused her to seek out treatment for the headaches. It was at this time that she was first prescribed Fioricet which is a prescription headache medication. She ultimately became dependent on the medication and her depression worsened culminating in a suicide attempt in 1996. The suicide attempt in 1996 led to hospitalization and then longer-term care which included substance abuse treatment. Through treatment she found sobriety and complete abstinence form all substances. In the aftermath of her hospitalization on ongoing recovery she eventually divorced from her first husband and met Charles Green whom she married in 1999. Mr. Green was a recovering alcoholic and was as committed to his recovery as Dr. Starer was to hers. Dr. Starer remains married to Mr. Green to this day.

       As time went on in her own recovery from substance abuse disorder Dr. Starer developed an increasing interest in substance abuse treatment and the role the medical

community played in recovery. Although she greatly enjoyed her work in the field of gynecology, she started to feel an increasing calling to use her medical knowledge and training to help others who struggled with substance abuse. In 2002 she formally began getting involved in the field of addiction medicine. Over the course of several years she became more and more involved with addiction medicine, eventually obtaining her certification in 2004. The focus of her practice shifted and eventually she dedicated herself to addiction medicine full time. By 2009 she was fully engaged in the practice of addiction medicine and became a pioneer in the field by joining with 4 other physicians to create the "Women's Action Group" A letter[5] from a co-founder of that group Dr. Mishka Terplain is included with this memorandum. In describing Dr. Starer's role in developing the Women's Action Group he stated:

*Jackie and I were amongst the first physicians in the US to be boarded in both OBGYN and Addiction Medicine. In 2009, with 3 other physicians we established the "women's Action Group" – a work group within the American Society of Addiction medicine (ASAM) dedicated to education research and clinical care related to gender and substance use disorder. I was the first chair of the group and she was the second. She grew the group incredibly and was critical in its early success. Today there are over 2,000 on our list serv and over 500 active members. This would not have happened without Jackie's early involvement.(Letter #9, Dr. Mishka Terplan, p. 1)*

Regarding her professional accomplishments he went on to state:

*She is recognized nationally as an expert in the clinical care of pregnant and parenting people with substance use disorder and has been integral to public health in Massachusetts. She served as both Chair and on the Board of the MA Chapter ASAM, served for almost a decade on the MA maternal mortality committee, provided expertise to MA Department of Public Health in the care of substance-exposed newborns, and helped develop state-wide protocols for pregnancy care. (Letter #9, Dr. Mishka Terplan, p. 1)*

---

[5] All letters written on behalf of the defendant have been included with this memorandum at Exhibit 2. For ease of reference the number of the letter, name of the reference, and page of the letter will be cited.

Another colleague Dr. Alan Warternberg described Dr. Starer's contributions to the field of addiction medicine as follows:

*Dr. Starer has made significant contributions to the education of and literature in the OB/GYN connection with SUDs. She has also worked as part of organized medicine through, through the Massachusetts Medical Society, MASAM and the OB/GYN Society, to disseminate important information about the proper diagnosis and management. Including culturally sensitive and empathic care. Much of this work is voluntary, and very few of us receive any recompense other than the satisfaction of helping people, many of whom are from marginalized communities, including people of color, immigrants, and those with significant co-occurring medical and psychiatric conditions. (Letter #10, Dr. Alan A. Wartenberg, p. 1)*

Dr. Starer's greatest pride in her professional life is the impact she has been able to make with individual patients. After suffering from Substance Use Disorder and then finding her footing again through recovery she has a personal connection to the field of addiction medicine that drives her passion for helping others. One patient, Christopher McKinney wrote the following about his time in treatment with her:

*Treating addicts in recovery felt like a very perso*

*nal passion for her – it was obvious that she had a bond with each of her patients. I often commented how there was enough demand that she could dramatically expand her operation, but she seemed much more interested in keeping the group small and personal vs. trying to maximize financial gain.*
*Knowing the importance of human connection to recovery, she started a group with her patients – she would have speakers come in from outside to share their experience with the group, and then there would be discussion while she saw her patients individually,. For some patients this was only AA/NA recovery activity they partook in, so it was of special benefit from them. (Letter #3, Christopher McKinney, p.1)*

Since her arrest in 2022 Dr. Starer has entered into a voluntary agreement not to practice with Massachusetts Board of Registration in Medicine and agreed to stay in that status until the resolution of this case. She fully understands that by resolving this case

by way of a plea and accepting responsibility for her actions it is very likely she has treated her last patient and will not be able to return to the practice of medicine. Reckoning with the loss of her professional identity has been especially difficult for Dr. Starer as she truly felt her calling in life was helping others who suffer from Substance Use Disorder. Having her ability to help others taken from her as a result of her actions has been devastating for both her and the patients she was serving at the time of her arrest. Her inability to do the work she loves so much has left a very large hole in her life which she struggles to fill. Likewise, Dr. Starer has struggled to cope with the loss of friends and personal relationships she has suffered as a result of her actions. Dr. Starer lives in Massachusetts where the events of January 6th are particularly unpopular, and upon her arrest the still video frame of her striking Officer M.B. was broadcast on every television station and put in every newspaper in the Boston area. As a result, she is socially isolated and only relies on a small circle of close friends and family for support. She has been the subject of relentless harassing phone calls and mailings since her arrest and has been threatened by people she does not know and has never met. She struggles accepting the fact that her lifetime of work doing good has been completely eclipsed by her actions on January 6th, and that her public legacy going forward will not be the legacy of a caring respected medical doctor, but instead publicly she will be remembered as a criminal who assaulted a police officer during one of the darkest days in our nation's history. She understands that all of this has come about as a result of her own actions, and while she cannot change the past she hopes to atone for her wrongdoing and plans to move forward as a law abiding citizen who impacts her community in a positive way.

While respected and admired in her profession Dr. Starer is also a kind and loving family member and friend to many people in her personal life. Her longtime friend Tom Zander in his letter commented:

*In the 57 years of my friendship with Jackie Starer, I have known he to consistently be a person of high intelligence, high moral character and compassion for others. The foundation of our friendship was our shared convictions in honesty and helping those who are less fortunate. Those are the moral convictions that drove me to be a public interest lawyer and a forensic psychologist with a pro bono practice. Those values led Jackie to be a physician to disadvantaged patients, such as pregnant women who struggle with substance abuse. Jackie and I often disagreed on matters of politics. But we nevertheless respected the sincerity of each other's convictions. We never let our political differences jeopardize our longtime friendship. (Letter #12, Thomas K. Zaner, p.2)*

Likewise, her friend Marina Schwartzman describes her as a "polite, genuinely good person" as well as someone who always tried to help others. In her letter Ms. Schwartzman recounted her bonding with Dr. Starer over their families' shared history of fleeing antisemitism in Europe to make a better life in America. She describes Dr. Starer as her "older, wiser friend who I can rely on" and specifically recounted a time where she asked Dr. Starer to help a friend's husband suffering from alcoholism and Dr. Starer offered assistance despite going through surgery herself at that time.

Charles Pluckham another lifelong friend of Dr. Starer writes of her patient, generous nature, recalling the kind way in which she would visit and comfort Mr. Pluckham's own mother at her assisted living facility until she passed in 2011. He also recounts more of the good work she did during her medical career caring for others. Other friends of Dr. Starer have offered their support in the form of letters and those are attached to this memorandum as Exhibit 1.

Dr. Starer's husband of 25 years is Charles Green, he is 76 years old and has been married to Dr. Starer since 1999. Mr. Green and Dr. Starer met as she was entering recovery and have remained committed partners to each other to this day. In his letter Mr. Green talks about the great pride he feels in his wife's own recovery and the way she cared for others going through substance use disorder. He also speaks of her incredible dedication in caring for her aging parents before they passed, regularly travelling to Wisconsin to help manage their medical care and living situation.

He also outlines the significant medical struggles he has suffered in recent years including heart attack, bladder cancer, bronchomalacia and aortic aneurism among several other issues. As a result of his deteriorating medical condition, he relies on his wife for help in the day to day managing of their household as well as with his daily care. He states:

*As you can see my age and health lead me to rely on her in these times and in the future. In my condition, we never know when the next ball will suddenly drop. I would have extreme difficulty managing my own care if she were not available to help me. (Letter #1, Charles Green, p.4)*

Due to Mr. Green's medical condition, he is unable to travel[6] to Washington, DC to be with his wife at her sentencing hearing, but he remains in full support of her, and is the greatest support Dr. Starer has in her life.

Dr. Starer also has her own complicated medical history for which she requires regular medical care. Now at age 70, Dr. Starer suffers from lengthy list of medical conditions[7] including back issues that have required two surgeries, as well as hip problems that required an arthroscopic procedure. In total she currently takes 9 different

---

[6] See attached letter #11 of Mr. Green's physician Dr. Lynn Weigel.
[7] A complete list of Dr. Starer's medical conditions and prescriptions is attached in letter #2 from Dr. Linda Lauretti.

medications to manage her medical issues and requires an intensive exercise therapy regiment to manage her back and hip issues. She is also engaged in mental health treatment with Dr. Virginia Merritt[8] with whom she has a long-term therapeutic relationship. Dr. Merritt began treating Dr. Starer in 2004 and formally diagnosed her with major depressive disorder, recurrent, moderate. While she has been in full or partial remission for much of the time Dr. Merritt has been treating her, she has also had full blown episodes of major depression. Dr. Merritt states in her letter that Dr. Starer is actively engaged in self-exploration and striving to make herself and the world a better place. She also remarks that based on their 20-year history of treatment together she predicts that Dr. Starer will remain committed to her mental health treatment going forward. Should Dr. Starer be incarcerated not only will she lose access to her mental health care, but at her advanced age her complicated medical conditions will almost certainly deteriorate and worsen.

Although Dr. Starer is politically conservative, she is not an extremist and has always had deep meaningful relationships with people of all political beliefs and backgrounds. The letters from friends and colleagues alike state on many different occasions that despite political differences of opinion Dr. Starer still remained a respected colleague, and trusted friend.

Dr. Starer is enormously regretful of her actions on January 6th, 2021. At her allocution she intends to offer her personal apology to Officer M.B. as well as an apology to all law enforcement offices present that day. Dr. Starer recognizes that her actions that day were gravely serious, well beyond what she understood as the events unfolded, and

---

[8] Dr. Starer's mental health diagnosis and treatment is outlined in letter #4 written by Dr. Merritt.

she is determined to take responsibility and move forward with her life in a productive and positive way.

## SENTENCING RECCOMENDATION

Pursuant to 18 USC § 3553(a) the court shall impose a sentence sufficient but not greater than necessary, to reflect the nature and circumstances of the offense and the history and characteristics of the defendant; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence; to protect the pubic from further crimes of the defendant; and to provide the defendant with needed educational/vocational training, medical care or other correctional treatment. With those parameters in mind Dr. Starer proposes a sentence of 36 months probation with the first portion of said sentence to be served in home confinement

. Such a sentence would provide just punishment and adequate deterrence while recognizing the unique factual circumstances of this case, Dr. Starer's medical condition, advanced age and obligations to care for her husband, as well as her exceptional history of service to the community. A sentence of home confinement is not without precedent among January 6th defendants facing charges of assault on a federal officer. In USA v. Matthew Council 1:21-CR-00207-TNM a defendant with significant mental health issues was sentenced to home confinement rather than jail for his assault on a line of officers for the purpose of advancing further into the Capitol. In USA v. Mark Leffingwell 1:21-cr-0005-ABJ the defendant was sentenced to only 6 months incarceration for repeatedly punching an officer in the head and chest who was attempting to deter his further advance into the Capitol. In USA v. Joseph Leyden 1:22-cr-00314-TNM was sentenced to only 6

months incarceration for assaulting an officer outside the Capitol who was attempting to regain control of a metal bike rack from rioters in an attempt to establish a barrier. In all of these cases the conduct of the individuals receiving these sentences was more egregious than the conduct of Dr. Starer. While Dr. Starer unequivocally assaulted a federal officer she did not assault the officer in attempt to further her advance into the capitol or to interfere with officers attempting to stop other rioters from advancing further into the Capitol. Given Dr. Starer's advanced age, her lifetime of positive contributions to her community, her complicated medical history, and the need to care for an ill family member, she asks this court to impose a sentence of home confinement rather than incarceration.

Respectfully submitted,
By her attorneys,

/s/ Robert Sheketoff
Robert Sheketoff
BBO# 457340
One McKinley Square
Boston, MA 02119
(671) 367-3449

/s/ Daniel Cappetta
Daniel Cappetta
BBO# 665860
150 Speen St. #201
Framingham, MA 017001
508-762-4540

## CERTIFICATE OF SERVICE

I, Robert L. Sheketoff, hereby certify that a copy of this pleading was served electronically this 24th day of October, 2010 on A.U.S.A Victor Wild.

/s/ Robert L. Sheketoff
Robert L. Sheketoff